ORIGINAL   cc: DKW/KSC

Buddy P. Kamakeeaina, Plaintiff Pro Se
2888 Ala Ilima Street, Apt. 1908
Honolulu, Hawaii 96818
Phone: (808) 859-3230
Email: bkamakee@outlook.com

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 07 2018

at 9 o'clock and 47 min. A.M.
SUE BEITIA, CLERK

United States District Court

for the District of Hawaii

CV18   00480 DKW KSC

| | |
|---|---|
| Buddy P. Kamakeeaina, | Civil Case No. _____ |
| Plaintiff Pro Se, | Complaint of Employment |
| vs. | Discrimination; |
| Armstrong Produce, Ltd., | Demand for Jury Trial; |
| Defendant. | Declaration. |

## Complaint of Employment Discrimination

My name is Buddy P. Kamakeeaina and I'm a 46-year-old disabled individual suffering

from, but not limited to, Post-Traumatic Stress Disorder (PTSD) and Depression as diagnosed by

multiple licensed healthcare professionals over the past 14 years.  Recently, due to my age and

disability, I believe I was blatantly and intentionally discriminated against by private employer

Armstrong Produce, Ltd. (hereinafter "Armstrong") during a hiring process on April 5th, 2018.

Prior to my claims against Armstrong as described herein, I had sustained and been

treated for traumatic injuries from previous employment-related discriminatory events that

occurred in late 2016 and early 2017.  After 6 months of intense treatment involving

psychotropic medications and psychotherapy sessions, I find myself in another employment

discrimination situation.  These discriminatory events have and continue to cause serious

traumatic injuries to my mental health because of my position as a victim with PTSD and as a

self-represented attorney in my pursuit of antidiscrimination justice.  As a result, consequential

harm from intentional infliction of emotional distress, mental pain and suffering and financial

losses have been, and continue to be, reluctantly tolerated.

Nevertheless, the following is a chronological summary of the events that

support my allegations of various violations of the Americans with Disabilities Act of

1990 (ADA), as amended; the Age Discrimination Act of 1975 & Age Discrimination in

Employment Act of 1967 (ADEA), as amended; §793(a) - Employment Under Federal

Contracts and §794 - Nondiscrimination under Federal grants and programs of the

Rehabilitation Act of 1973, as amended and as allegedly committed by Armstrong.

(NOTE: All italicized and underlined words are emphasized):

1.      On **March 20th, 2018,** I completed an Armstrong website PDF-filler application for a

Receiver II/Forklift Operator position as advertised via an online Craigslist job posting.

2.      On **March 21st, 2018,** I submitted said application and my employment history résumé

to Armstrong's main office at 802 Mapunapuna Street, Honolulu, HI 96819.

3.      On **March 23rd, 2018,** I attended my first pre-employment interview with Armstrong

Safety Coordinator, Mr. Derrick Nakamoto.  After discussing with Mr. Nakamoto various

aspects of the job's position and reviewing my submitted résumé, Mr. Nakamoto informed

me of my next upcoming interview with Armstrong's Warehouse Receiving Supervisor, Mr.

Clark Pantil, my potential supervisor should I be hired for said position.  Furthermore,

during the waiting period *before* and immediately *after* said interview, I noticed other male

applicants whom, at first glance, were significantly younger than my 46-year-old age by at

least *eight (8) to ten (10) years*.

4.      On **March 26th, 2018,** I attended my second pre-employment interview with

Armstrong's Warehouse Receiving Supervisor, Mr. Clark Pantil.  After discussing various job-

related duties and relative past skills with Mr. Pantil, Mr. Pantil escorted me throughout the

facility to familiarize me with the day-to-day operations as expected of the Receiver

II/Forklift Operator.  Again, during the waiting period *before* and immediately *after* said

interview, I noticed other male applicants whom, at first glance, were significantly younger

than my  46-year-old age by at least *eight (8) to ten (10) years*.

5.      On **March 31st, 2018,** after both Mr. Nakamoto's and Mr. Pantil's determination that I

was capable of performing, with or without reasonable accommodation, the essential

functions of the Receiver II/Forklift Operator position, I received a post-job offer from

Armstrong which listed nine (9) *conditional requirements* in order to finalize employment:

1. My dated signature accepting the post-job offer's conditional requirements;
2. My *birthdate* for criminal background check purposes;
3. My *social security number* for criminal background check purposes;
4. My signature acknowledging the Receiver II job description's requirements;
5. My signature acknowledging the Work Opportunity Tax Credit (W.O.T.C.) IRS form;
6. My negative test results for Tuberculosis within the past twelve (12) months;
7. Two forms of valid identification (e.g., State ID Card, Social Security ID Card, etc.);
8. My *successfully passing an on-site drug test* at Armstrong's Mapunapuna facility;
9. My *successfully passing a criminal background* check following the submittal of my *birthdate* and *social security number* (see items no.2 & no.3).

**April 5th, 2018 Post-Job Offer Interview Between Applicant Buddy P. Kamakeeaina and Human Resource Director Marlene L. Mckenzie ("Marlene") of Armstrong Produce, Ltd. at 802 Mapunapuna Street, Honolulu, HI 96819 (Interview Duration: *Approx. 07 min. 11sec.*).**

6.      On **April 5th, 2018** during my third pre-employment interview at Armstrong's

Mapunapuna facility, I submitted to Marlene items no.1 thru no.6 of the post-job offer

*conditional requirements* as listed above.  Moreover, I had attended the interview with

the intention of *completing items no.7 thru no.9* of said requirements .

7.      From the onset of the April 5th interview and as required under the "Certification"

section on page no. 3 of Armstrong's official 5-page application, *I informed Marlene of my*

*registered status* under the State of Hawaii, Department of Health's, Medical Cannabis

Program (hereinafter "DOH/MCP") via the submittal of a *colored-copy* of the approved-

registration letter dated 12/01/2017 which also included my medical marijuana certification

card and an informative checklist.

8.      In response, Marlene openly admitted, "I've *never* seen a letter like this!"; she also

admitted, "I've *never* had one come up like this before."; and she also admitted, "I'm going

to have to *do some research*" regarding my DOH/MCP claims.

9.      In response, I gave Marlene verbal permission to *verify my registration status* by

suggesting that she *contact the DOH/MCP* and obtain confirmation via my DOH/MCP

registration number as displayed on the submitted *colored-copy* of my DOH/MCP letter.

10.     I also submitted to Marlene additional DOH/MCP documentation (hereinafter

"informative checklist") included with the DOH/MCP letter informing me of, but not limited

to, State law(s) forbidding public use, including prohibited use of medical marijuana at an

individual's *place of employment*.

11.     In support of the informative checklist, I told  Marlene that, in regard to former

employers, the issue of medical marijuana *had never been a cause for concern* during

previous employment.

12.     In my first attempt to explain to Marlene details of my medical issues, Marlene

interrupted me by saying, *"You don't have to disclose any medical information, don't feel*

*like you have to explain."*.

13.     In my second *uneasy* attempt to discuss my medical issues, Marlene emphasized her

earlier statements of 'no medical disclosure' by saying, *"No, please don't."*. From that

moment on, I not only felt *uncomfortable*, but I felt *compelled* to obey Marlene's 'no

medical disclosure' statements *out of fear* of having the job offer rescinded.

14.     I informed Marlene of a previous discussion I had with my wife regarding our awareness

of the sensitive nature of medical marijuana's acceptance because of Hawaii's *recent*

*passage of its medical marijuana law(s)*); the federal government's *prohibition of* marijuana

*prescriptions*; and the *negative social stigma* regarding traditional thinking of marijuana-

related issues.  In response, Marlene said she totally understood.

15.     Again, I gave Marlene verbal permission to *verify my registration status* by suggesting

that she *contact the DOH/MCP*.  I also informed Marlene that I was *protected under the law*

in regard to my physician's *recommendation*.  In response, Marlene inquired by saying,

*"Recommendation?"* for which I responded by saying, "Yeah."

16.      After saying to Marlene, "*How am I going to handle this*?", Marlene informed me that,

relative to Armstrong's drug policy, "We do have a drug policy and we call it *post-offer*, is

*contingent* upon successfully passing this (drug test). *Our policy is based on the federal law*."

17.     In support of Armstrong's federally-enforced drug policy, Marlene offered an example involving _former employees_ whom, like me, were in possession of medical marijuana certifications yet after _failing_ a required drug test for marijuana, Armstrong deemed the _positive test results_ a violation of said drug policy.

18.     Then Marlene  said, "_I'm unsure_ whether to tell you that we'll go through the testing." In addition, Marlene also said, "You know, _if it's positive_, unfortunately, _we would have to withdraw the offer_." At this point, I'm concerned that Marlene _assumes_ that I'll either fail the drug test or, if hired, I'd eventually use medical marijuana sometime during my employment at Armstrong.

19.     Again, Marlene said, "Our policy follows the _federal statutes_" and also said, "Every company can make their own policies, some can be more stringent or more lenient _as far as we follow the federal guidelines._" Then Marlene said, "Unfortunately, I do know what the State's law is here" and "I do know that _our policies are legal in following the federal_ (laws), but I can understand if people who have a State authorization kind of feel like, 'Huh?'".

20.     At this point, I'm confused and feeling discouraged when I say to Marlene, _"What do I do now?!"_. Nevertheless, and based on Marlene's earlier statement of having to withdraw the post-job offer _if the required drug test is positive_ (see ¶ no.18), I informed Marlene that, "I am prepared to have the offer taken off the table." Marlene responds by stating, "Oh, I feel, I feel like crap. Sorry." In response, I said, "I just wanted to be straight-up from the beginning and if I were to get the job, it'll be a way easier transition for everyone involved.". In response, Marlene says, "Sure, sure. To be upfront and honest."

21.     All of a sudden, and on her own unprovoked volition, Marlene *incorrectly* assumed that

my medical marijuana certification's purpose was to treat "*physical*" pain-relief.  By

comparing me to *former employees*, Marlene said, "The couple situations we've had, I know

how, *I know what a good treatment it is for pain* and that was *our employee who had most*

*recently taking it for real bad* (pain), I don't know if it was *a dislocated shoulder* or

something? And the pain meds were just, *too many side-effects!*".

22.     Although my medical marijuana certification is based on a qualifying disability of a

"*psychological*" disorder of PTSD, *I was afraid* to correct Marlene due to her earlier

statements regarding 'no medical disclosure' (see ¶ no.12 & ¶ no.13).  However, I did offer

a related experience by saying, "In my situation, was *three different types of medications*

and the combination of all three rendered me *incapable* (and) *incompetent*."

23.     Marlene then said, "For that, I feel bad you know. And you know, *kind of scary* now

because *you guys are being good* because *with all the opioid abuse*"; "you don't want to

get…(addicted)"; "my husband was taking some *pain killers* and I was getting *worried about*

*opioid abuse!*"

24.     At this point, I'm confused that Marlene would refer to my medical marijuana

certification as "*you guys are being good*" while simultaneously saying it's "*kind of scary*"

and "*abusive*" in comparison to her husband's addictive use of "*pain killers*" and "*opioid*

*abuse*".  In a related response, I say, "It's addiction, it's addictive either if it's the illegal one

or the legal one."

25.     Then, without warning, Marlene *rescinds* the job offer by saying, "I regret,

unfortunately, that we *cannot* move forward." Contrary to Marlene's earlier statements

(see ¶ no.16 & ¶ no.18), Marlene rescinds the job offer *without* administering the required

drug test and *without* completing the required criminal background check *as afforded to*

*other applicant(s) and/or former/current employee(s)*.  Then Marlene gave me her

*Armstrong business card* and said, "I'll give you my card, in case, you know, you have

questions later on and you want to contact me."

26.     In response to my confusion, Marlene justified her decision to rescind the job offer by

telling me about "*a lot of discussions*" that she's had with Armstrong's "*company attorneys*"

who confirmed Armstrong's compliance with "*state law in following federal guidelines*".

Marlene also admitted to this as being a "*round-about way*" of addressing medical

marijuana-related state laws as it relates to Armstrong's federally-enforced drug policy.

27.     At this point, I realized Marlene's decision to rescind the job offer is firm and final.  As a

result, I told Marlene, *"I don't know how to handle this!"* and that I'd look elsewhere for

employment.  In response, Marlene returns the submitted copy of the DOH/MCP letter to

me by saying, "Then you know what, *I going give this back,* because *colored-copies* (see ¶

no.7) cost plenty money!" and she apologizes for Armstrong's drug policy by saying, "I

appreciate you being honest and *I'm sorry to tell you what our policies are here*."

Confused and frustrated, I ask Marlene, "*So, I'll get a letter in the mail then?*" which I expected

would document the outcome of the April 5th interview which, in turn, Marlene confirms by

saying, "*Yup*."  Marlene then told me, "Thank you for coming in, this is important."  At this

point, the interview ends as Marlene escorted me to the elevators, down to the first floor and

out of the building's front doors leading to the parking lot where I proceeded to leave the

Armstrong's Mapunapuna facility.

**Conclusive Findings in Support of Discriminatory Claims Against Armstrong**

I.      **Applicant's Status as a "Qualified Individual" Confirmed Pursuant to the ADA**

After both meetings with Armstrong Safety Coordinator, Derrick Nakamoto and

Armstrong Warehouse Receiving Supervisor, Clark Pantil, I was deemed a *qualified individual*

for the Receiver II/Forklift Operator position and, as a result, I was offered said position via a

post-job offer letter pending the acceptable results of said offer's conditional requirements (see

¶ no.5).  Accordingly, §12111(8) of the ADA defines *qualified individual* as follows:

"The term "*qualified individual*" means an individual who, with or without reasonable
accommodation, *can perform the essential functions of the employment position* that such
individual holds or desires. For the purposes of this subchapter, consideration shall be given to
the employer's judgment as to what functions of a job are essential, and *if an employer has
prepared a written description before advertising or interviewing applicants for the job, this
description shall be considered evidence of the essential functions of the job.*"

Furthermore, and as stated in Armstrong's post-job offer's conditional requirements, I

submitted to Marlene the Receiver II/Forklift Operator Job Descriptions notification which I

signed and dated acknowledging the receipt of and acceptance of said job descriptions *before*

Marlene refused to hire me for said position (see ¶ no.6).  Therefore, I reaffirm that I could

have performed 100% of the essential functions of Armstrong's Receiver II/Forklift Operator

position, with or without reasonable accommodation, just as well as any other non-disabled

applicant should I have been given an equal opportunity to do so.

II.     **Armstrong's Violation of the Age Discrimination in Employment Act of 1967 (ADEA) &
        Age Discrimination Act of 1975**

The April 5th interview began with the submittal of my signed acknowledgment

accepting the post-job offer which also included both my required *birthdate* and social security

number *as needed by Armstrong* to conduct a standard criminal background check.  However,

due to Marlene's immediate retraction of the post-job offer approximately six minutes into the interview, my birthdate and social security number *had NOT been used for its intended purpose* of conducting a criminal background check *which Armstrong said it needed it for* (see ¶ no.5).

Furthermore, I had noticed during both of my scheduled appointments with Armstrong Safety Coordinator, Mr. Derrick Nakamoto on March 23rd, 2018 and Armstrong Warehouse Receiving Supervisor, Mr. Clark Pantil on March 26th, 2018 that *all other applicant's applying for the same Receiver II/Forklift Operator* position were at least between *eight (8) and ten (10) years younger* than my 46 years of age (see ¶ no.3 & ¶ no.4).

Therefore, since Marlene had in her possession *my birthdate* since the start of the April 5th interview yet rescinded the post-job offer approximately 6 minutes into said interview *without conducting the criminal background check as proposed*, I'm alleging that Marlene's refusal to hire me was because of, but not limited to, my age of 46 years which, in turn, actually resulted in the hiring of a *considerably younger person* for the position of which I was denied in violation of the Age Discrimination in Employment Act of 1967 and Age Discrimination Act of 1975 as described as follows:

- Age Discrimination in Employment Act of 1967, § 623 - Prohibition of age discrimination a) "It shall be *unlawful* for an employer - (1) to fail or *refuse to hire* or to discharge any individual *or otherwise discriminate against any individual* with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's age*;

- Age Discrimination Act of 1975, §6102. Prohibition of discrimination: "Pursuant to regulations prescribed under section 6103 of this title, and except as provided by section 6103(b) of this title and section 6103(c) of this title, *no person* in the United States shall, *on the basis of age*, be excluded from participation, in be denied the benefits of, *or be subjected to discrimination* under, any *program or activity* receiving Federal financial assistance. "

### III.  Armstrong's Failure to Reasonably Accommodate Disabled Applicant Violates the ADA

After the *voluntary release* of my DOH/MCP registration status letter and *verbal consents* to confirm the validity of said status (see ¶ no.7, ¶ no.9, & ¶ no.15), Marlene *coerced* me into *withholding* any additional medical information after my attempt at trying to discuss my disability-related issues (see ¶ no.12 & ¶ no.13).  As a result, I felt *compelled* to obey Marlene's 'no medical disclosure' statements *out of fear* of having the post-job offer rescinded. Therefore, I allege that Marlene's *coercive intent* was to avoid Armstrong's legal obligation to seek reasonable accommodations for applicants whom are *qualified individuals with disabilities*.

Furthermore, and as stated on page no. 3 of Armstrong's official 5-page employment application, applicant(s) "agree to *fully cooperate and provide* the Company with any additional *consent(s)* and/or *release(s)* as required by the Company *to investigate* employment applications."  However, my *verbal consents* to confirm the validity of my registered status, my *voluntary release* of multiple DOH/MCP documents and my concerns of the *negative stigma* surrounding marijuana-related issues to Marlene were *blatantly ignored* and *returned* (see ¶ no.7,  ¶ no.9, ¶ no.10, ¶ no.14, ¶ no.15, & ¶ no.27).  After telling Marlene multiple times, "I don't know how to handle this!" and "What do I do now?", Marlene's *lack of assistance* and *failure to retain my medical records* (see ¶ no.16, ¶ no.20, & ¶ no.27) also supports my claims of Armstrong's violation of the following ADA statutes:

- §12112(b)(1) by "*limiting*, segregating, or classifying *a job applicant* or employee in a way that *adversely affects the opportunities* or status *of such applicant* or employee *because of the disability of such applicant* or employee".
- §12112(b)(5)(B) "*denying employment opportunities to a job applicant* or employee who is an otherwise qualified individual with a disability, if such *denial is based on the need of such covered entity to make reasonable accommodation* to the physical or mental impairments of the employee *or applicant*."

- §12112(d)(3)(B) "information obtained regarding the medical condition or history of the applicant is *collected and maintained on separate forms and in separate medical files* and is treated as a confidential medical record, except that:

  > -*supervisors and managers* may be informed regarding necessary restrictions on the work or duties of the employee and *necessary accommodations*;
  > -*first aid and safety personnel* may be informed, when appropriate, if the *disability might require emergency treatment*; and
  > -*government officials* investigating compliance with this chapter *shall be provided relevant information on request*;"

- §12203(b) "It shall be unlawful to *coerce*, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

## IV.   "Regarded as Having Such an Impairment" by Armstrong Confirms Applicant's Status as a Qualified Individual with Disabilities Pursuant to the ADA

Marlene's statements and inquiries regarding medical marijuana of either being my physician's "*Recommendation?*" or a "*good treatment*" for "*real bad*" (pain) due to a former employee's "*dislocated shoulder?*" and how the former employee's prescription pills had "*too many side-effects!*" violated the ADA's prohibition of pre-employment medical examinations or inquiries "as to the *nature or severity* of such disability", albeit Marlene *incorrectly assumed* that my medical marijuana certification was used to relieve *physical* pain-related ailments (see ¶ no.15, ¶ no.21 & ¶ no.22).

Moreover, Marlene's *biased speculations* and *generalized fears* of drug abuse and/or drug addiction (see ¶ no.23 & ¶ no.24) contributes to the *negative social stigma* of traditional antimarijuana-type thinking (see ¶ no.14) while simultaneously, yet prematurely, *classifying* me as a drug abuser and/or drug addict in comparison to her husband's addictive use of opioid drugs for physical pain-relief.

Therefore, not only did Marlene "regarded me as having a *physical* impairment" when she assumed that my medical marijuana certification had been authorized to treat *physical* pain-relief, but she also "regarded me as an addictive drug abuser" when she compared me to her husband's opioid addiction which, in turn, violated the following statutes under the ADA:

- §12102(3)(A) "An individual meets the requirement of "*being regarded as having such an impairment*" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an *actual or perceived* physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."
- §12112(b)(1) by "limiting, segregating, or *classifying a job applicant* or employee in a way that *adversely affects the opportunities* or status *of such applicant* or employee *because of the disability of such applicant* or employee".
- §12112(d)(2)(A) "(A) *A covered entity shall not* conduct a medical examination *or make inquiries of a job applicant* as to whether such applicant is an *individual with a disability* or as to the *nature or severity* of such disability."

**V.      Armstrong's Failure to Establish Current Use of Illegal Drugs Confirms Applicant's Status as a Qualified Individual with Disabilities Pursuant to the ADA**

Armstrong's failure to administer the job offer's drug test not only *fails* to prove *current engagement* in the illegal use of drugs, but it also blatantly denies me equal employment opportunities as afforded to other disabled/non-disabled applicant(s) and/or former/current employees (see ¶ no.25).  Furthermore, *at no time during the entire April 5th Interview* did I admit, confess, or make any voluntary comments regarding any current engagement in the illegal use of drugs. In addition, *at no time during the entire April 5th Interview* did Marlene inquire into the frequency, duration, or most recent or actual use of medical marijuana.  Any medical marijuana statements made on my behalf referred *only* to the following:

1. DOH/MCP documents dated 12/01/2017 of my registered status, official certification card, and informative checklist (see ¶ no.7);
2. Prior discussion with my wife regarding historically-biased, negative stigma-type thinking of marijuana prohibition (see ¶ no.14);

3. Hawaii's passage of medical marijuana state laws vs. federal laws prohibiting marijuana prescriptions (see ¶ no.14);
4. My physician's recommendation of the medical benefits of medical marijuana (see ¶ no.15);
5. Vague description of adverse side-effects of previously prescribed medications (see ¶ no.22).

Collectively, items no.1 thru no.5 *do NOT confirm nor are they evidence of* the current engagement in the illegal use of drugs.  Furthermore, the DOH/MCP *does NOT manufacture, distribute, sell, prescribe, dispense, nor treat patients with medical marijuana*.  One of the DOH/MCP's responsibilities is to legitimately certify a patient's physician-recommended use of medical marijuana based upon the patient's *qualifying disability*.  Accordingly, the DOH/MCP approved my registered status because of my *qualifying disability of PTSD*.

Moreover, although my physician may have *recommended* medical marijuana to treat the symptoms of my PTSD, I am NOT bound by this recommendation.  Medical marijuana is an *alternative option* to PTSD treatment, as are other available treatment options for mentally impaired individuals.

Furthermore, Marlene's various *assumptions* that, like her husband, I'd become an *addictive drug abuser* or that my medical marijuana certification had been authorized for *physical* pain-relief (see ¶ IV) *are biased, unwarranted, inappropriate and incorrect*.  While simultaneously comparing me to former medical marijuana certified employees whom, *unlike me*, had failed required drug tests for marijuana (see ¶ no.17 & ¶ no.18), Marlene also *assumed* that I would have failed the post-job offer's required drug test *based on my submitted DOH/MCP documents*.

Therefore, by *failing to adequately administer* the required drug test due to Marlene's aforementioned assumptions, Armstrong *erroneously* regarded me as currently engaging in the

illegal use of drugs, when in fact, *there exists NO evidence of any current engagement in the use*

*of any illegal or legal drugs* which, in turn, violates the following statutes under the ADA:

- §12112(b)(7) "Failing to select and *administer tests* concerning employment *in the most effective manner* to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, *such test results accurately reflect* the skills, aptitude, or *whatever other factor of such applicant or employee that such test purports to measure*, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure)."
- §12114(b)(3) "Rules of construction. Nothing in subsection (a) of this section shall be construed to exclude as a qualified individual with a disability an individual who is *erroneously* regarded as engaging in such use but is not engaging in such use;".

## VI.      Drug-Free Workplace Act of 1988 (DFWA) Inappropriately Applied to Applicant

To justify her claims of Armstrong's drug policy's compliance to "federal law, statutes,

guidelines" (see ¶ no.16, ¶ no.17, ¶ no.19 & ¶ no.26), Marlene had referred to the Drug-Free

Workplace Act of 1988 (hereinafter "DFWA") which is the foundation of Armstrong's drug

policy due to Armstrong's business transactions with the federal government which, in turn,

obligates Armstrong's compliance under §701 et seq. of the DFWA as follows:

- "…notifying *employees* that the *unlawful* manufacture, distribution, dispensation, possession, or use of a controlled substance *is prohibited in the person's workplace*…"
- "…*the individual will not engage* in the *unlawful* manufacture, distribution, dispensation, possession, or use of a controlled substance *in the performance of the contract*…"
- "…*the individual will not engage* in the *unlawful* manufacture, distribution, dispensation, possession, or use of a controlled substance *in conducting any activity with such grant*…"
- "…which *employees* of such entity are prohibited from engaging in the *unlawful* manufacture, distribution, dispensation, possession, or use of a controlled substance *in accordance with the requirements of this Act*…"
- "…the term ''controlled substance'' means a controlled substance in *schedules I through V of section 812 of title 21*…"

As described above, the DFWA *only applies to hired employee(s)* and/or *the contracted*

*employer(s)* whom are at the *workplace* and *NOT pre-employment applicants*. Therefore,

Armstrong's DFWA-enforced drug policy was *falsely, blatantly* and *intentionally* used by

Marlene to *deny me equal employment opportunities afforded to other applicants and/or*

*former/current employees* due to, but not limited to, *my DOH/MCP medical marijuana*

*certification* which Marlene *regarded as a violation* of said drug policy which, in turn, violated

§12112(b)(6) of the ADA:

- §12112(b)(6) "using *qualification standards*, employment tests *or other selection criteria* that screen out or *tend to screen out an individual with a disability* or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity;"

## VII.    Armstrong's Violations of the ADA Violates Statutes of the Rehabilitation Act of 1973

As described herein, Armstrong's alleged discriminatory acts in turn violated the

following statutes pursuant to the Rehabilitation Act of 1973 as described as follows:

- §793(a) - Employment Under Federal Contracts: "Any contract in excess of $10,000 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services (including construction) for the United States shall contain a provision requiring that the party contracting with the United States *shall take affirmative action to employ and advance in employment qualified individuals with disabilities*. The provisions of this section shall apply to any subcontract in excess of $10,000 entered into by a prime contractor in carrying out any contract for the procurement of personal property and nonpersonal services (including construction) for the United States. The President shall implement the provisions of this section by promulgating regulations within ninety days after September 26, 1973."

- §794 - Nondiscrimination under Federal Grants and Programs: "No otherwise *qualified individual with a disability* in the United States, as defined in section 705(20) of this title, *shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination* under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service..."

## VIII.    Harm Caused by Armstrong's Discriminatory Acts & Relief Sought

Immediately following the retraction of Armstrong's post-job offer, I became

increasingly depressed each passing day and each and every time I saw an employment ad

requiring both a drug test and criminal background check.  As time went on, and whilst still

seeking employment, my depressive disorder and PTSD worsened which resulted in my complete isolation from society without any hope of being employed.

In an attempt to make sense of my unfortunate situation, I began to investigate Armstrong's claims of compliance, albeit in a "*round-about way*", to both state and federal law in regard to Armstrong's DFWA drug policy and its hiring practices.

However, although I had acquired throughout this 8-month long investigative endeavor clear and accurate evidence of multiple discriminatory acts committed by Armstrong, doing so has had its share of consequences.  For example, as a disabled individual who suffers from PTSD and depression, the resulting adverse symptoms caused by Armstrong's discriminatory treatment has intensified due to my persistent pursuit of investigative and legal efforts to defend myself throughout this litigation process.

Throughout the past 8 months, I've been having daily problems with either sleeping, eating, concentrating, thinking, working and/or mood swings thereby causing my psychological state-of-mind, my social affairs and financial situation to worsen.

In retrospect, I did not deserve to be treated in such a blatant, callous and demeaning way by an administrative-level Human Resource Director whom, as the title portrays, should be more of a positive facilitator which directs their professional conduct in a more humane way towards all applicants and employees with or without disability-related concerns. Therefore, as a direct result of Armstrong's alleged discriminatory acts as described herein, Armstrong is liable for the intentional infliction of emotional distress, mental pain and suffering, compensatory damages, loss of wages, attorney fees and punitive damages for which *I seek the monetary relief of $450,000* from Armstrong for said damages.

**IX.**      **Notice of Right to Sue Confirmed, Demand for Jury Trial, & Official Word Count**

• Pursuant to Title 29 CFR 1601.28 – "Notice of right to sue: Procedure and Authority",

the Equal Employment Opportunity Commission (hereinafter "EEOC") has issued me a formal

"Dismissal and Notice of Rights" letter signed & dated on 09/21/2018 and received on

09/23/2018 allowing me to file an employment discrimination lawsuit against Armstrong in the

United States District Court for the District of Hawaii within (90) ninety-days from date of

receipt of said notice (see attached Exhibit M-1).

• Plaintiff hereby demands a jury trial in this matter as afforded under the laws of the

United States of America and the State of Hawaii.

• This complaint's official word count is: 5,958.

**X.**      **Conclusion & Declaration**

From the onset of the April 5th interview, and after submitting both my *birthdate* and a

*colored-copy* of my DOH/MCP confidential medical documents, Marlene went from admitting

she never before saw said documents, to never encountering an incident like this before (i.e.,

46-year old, disabled applicant submitting confidential medical documents from the

DOH/MCP), to admitting that, in accordance to applicable federal law, successfully passing the

drug test is *contingent* upon the post-job offer's requirements and Armstrong's DFWA-enforced

drug policy.  In addition, Marlene offered past examples involving former employees whom, like

me, possessed a medical marijuana certification yet, unlike me, failed employer-required drug

test for illegal drugs thereby violating Armstrong's DFWA drug policy.  Then Marlene said, "You

know, *if it's positive*, unfortunately, *we would have to withdraw the offer*."  However, Marlene

failed to administer Armstrong's job-offer drug test *before* rescinding the job-offer.

In comparison to other disabled people, Marlene "regarded me as having a *physical impairment*" when she inquired into the *nature and severity of my disability* as she *incorrectly perceived it* thereby prompting her belief that my medical marijuana certification was authorized to treat *physical pain*-related ailments when, in fact, my certification is recommended to treat symptoms of PTSD, a *psychological* disorder.  Again, and in comparison to her husband's use of *highly-addictive pain-relieving opiate drugs*, Marlene "regarded me as an *addictive drug abuser*" when she inquired into the *nature and severity of my disability* as she *incorrectly perceived it* thereby prompting her belief that, like opiate drug addicts, the outcome of using medical marijuana shares the same ominous faith.

Then, *without* warning, Marlene *rescinds* the job-offer based on numerous discussions she's had with Armstrong attorneys confirming Armstrong's compliance to State & Federal laws--which she failed to mention to me from the onset of the interview--and my submitted confidential DOH/MCP medical documents--the same documents she admitted *never* seeing before.  Apparently, and in lieu of an official drug test, the mere fact that I possess a medical marijuana certification violates Armstrong's DFWA drug policy which, according to Marlene, is based on federal law.  *This makes no sense*. Federal law prohibits the *use* of illegal drugs pursuant to the Controlled Substance Act and *NOT the possession of various medical marijuana certification documents*.  As described herein, *at no time during the entire April 5th interview* did I admit, confess, or make any voluntary comments regarding any current engagement in the illegal use of drugs.  In addition, *at no time during the entire April 5th interview* did Marlene inquire into the frequency, duration, or most recent or actual use of medical marijuana.

Marlene knew of her *legal obligation to retain confidential medical information* revealed to her during the hiring process yet, on her own volition, intentionally returned *the colored-copy* of my confidential medical documents to me *after* rescinding the job-offer in violation of the ADA as described herein.  In addition, Marlene intentionally *coerced* me to withhold any additional medical information to avoid *Armstrong's legal obligation to attempt to reasonably accommodate qualified individuals with disability(s)* pursuant the ADA.

Therefore, the post-job offer required a drug test and a criminal background check in addition to Marlene saying that it was *contingent* that I successfully pass said drug test in compliance with Armstrong's post-job offer's requirements, drug policy and federal law. However, and on her own *assumptions*, Marlene decided to rescind the job offer because of my submitted DOH/MCP certification, her generalized fears of drug addiction and/or drug abuse and because she believes that applicants and employees with medical marijuana certifications are violating federal law relative to Armstrong's DFWA drug policy. According to Marlene, in lieu of an official drug test, possession of said certification nullifies Armstrong's legal obligation to make reasonable accommodations for qualified disabled applicants, validates Armstrong's adverse actions contrary to the job offer's conditional requirements and justifies her refusal to hire me for the said position *without evidence of current engagement in the illegal use of drugs*.

### Declaration

I declare, under penalty of perjury, that the foregoing is true and correct under the laws of the United States of America.

Signature: _____     Date: Date: December 7th, 2018

Buddy P. Kamakeeaina, Plaintiff Pro Se

EEOC Form 161 (11 16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Buddy Kamakeeaina<br>2888 Ala Ilima St., #1908<br>Honolulu, HI 96818 | From: | Honolulu Local Office<br>300 Ala Moana Blvd<br>Room 4-257<br>Honolulu, HI 96850 |
|---|---|---|---|

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **486-2018-00446** | **Emily Mauga,**<br>**Office Automation Asst** | **(808) 541-3118** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Enclosures(s)

| Glory Gervácio Saure,<br>Local Office Director | 9/21/18<br>*(Date Mailed)* |
|---|---|

cc: **Kelvin Shigemura**
**VP**
**ARMSTRONG PRODUCE LTD.**
**802 Mapunapuna Street**
**Honolulu, HI 96819**

Exhibit M-1